## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF COLORADO
### The Honorable Michael E. Romero

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 10-38306 MER |
| JOHN CHARLES THOMAS | ) | |
| MICHELLE LYNNE THOMAS | ) | Chapter 7 |
| | ) | |
|     Debtors. | ) | |
| | ) | |
| | ) | |
| CHRISTOPHER LYKINS | ) | Adversary No. 11-1056 MER |
| LORI J. WAKNIN | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| JOHN CHARLES THOMAS | ) | |
| | ) | Signed/Docketed |
|     Defendant. | ) | December 27, 2013 |

### ORDER

THIS MATTER comes before the Court on the Complaint filed by Plaintiffs Christopher Lykins ("Lykins") and Lori J. Waknin ("Waknin") (collectively, the "Plaintiffs"), and the Answer filed by Debtor-Defendant John Charles Thomas ("Thomas"). The Court has considered the evidence and arguments presented by the parties, and hereby makes the following findings of fact and conclusions of law.

### JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) because it involves determinations as to the dischargeability of a particular debt under 11 U.S.C. § 523(a)(2)(A), (a)(4) and (a)(6).[1]

---

[1] Unless otherwise noted, all future statutory references in the text are to Title 11 of the United States Code.

# BACKGROUND

## A.    The Consignment Agreement and Sale of the Vehicle

Waknin, Lykins, Thomas and Christopher Blair Teta ("Teta") are all residents of Colorado.  On March 17, 2006, Thomas and Teta formed Spotlight Motors, LLC ("Spotlight") under the laws of Colorado.  At all relevant times, Thomas and Teta were the sole owners and members of Spotlight, and shared equally in all management responsibilities.  Spotlight, at the time of the subject transactions, was a licensed Colorado automobile dealer and engaged in the business of selling used automobiles to the retail public.

On July 21, 2009, Waknin and Spotlight, through Teta, entered into an agreement for consignment of Waknin's 2002 Mercedes Benz CLK 430 (the "Vehicle") to Spotlight to be sold (the "Consignment Agreement").[2]  The Consignment Agreement is handwritten, signed by Teta and states, in total:

> Spotlight Motors to consign 2002 M-B CLK430 starting 7/21/09. Ask price $24,995.  Seller Fee 10% of selling price t.b.d. by Lori Waknin plus $250 for marketing (nonrefundable).[3]

Waknin negotiated the Consignment Agreement with Teta only, and Thomas did not make any representations to Waknin regarding the Consignment Agreement or a payoff of the Vehicle's existing lien.[4]  However, at all relevant times, Thomas and Teta knew Public Service Credit Union ("PSCU") held a lien against the Vehicle in the amount of $15,960.20.

Over a month later, on August 28, 2009, Lykins saw the Vehicle on Spotlight's car lot and negotiated with Thomas for the purchase of the Vehicle. Lykins ultimately agreed to pay a grand total of $21,385.42 in exchange for the Vehicle, which included the $19,500 sale price, plus additional dealer fees and taxes in the amount of $1,885.42.[5]  Lykins tendered to Spotlight a cashier's

---

[2]  Exhibit 1 (Consignment Agreement).

[3]  Exhibit 1.

[4]  Transcript (Oct. 12, 2012), p. 95, lines 1-12; p. 96, lines 5-8.

[5]  Exhibit 5 ("Buyers Order and Invoice" dated August 28, 2009). As part of the sale documents, Plaintiffs also introduced Exhibit 9 ("Disclosures Required as Part of a Motor Vehicle/Powersports Vehicle Sales Contract" dated August 28, 2009 signed by Thomas and Lykins) and Exhibit 10 ("Buyers Guide" showing the Vehicle was purchased "As Is - No Warranty").

check dated August 28, 2009, in the amount of $21,382.42.[6]  In return, Lykins received a "Dealer's Bill of Sale for a Motor Vehicle" dated August 28, 2009, identifying Thomas as the dealer's agent and Lykins as the buyer, along with a "Standard Sales Tax Receipt."[7]

From the $19,500 portion of the certified funds from Lykins, Spotlight deducted a commission in the amount of $1,950 (10% of the $19,500 "selling price") and an $85 fee for detailing the Vehicle prior to sale.[8]  Spotlight noted $15,960.20 would be withheld for the payoff of the PSCU lien,[9] and paid Waknin the remaining net amount of $1,504.80.[10]  Waknin acknowledged receipt of $1,504.80 from Spotlight, representing her total profit from the sale of the Vehicle to Lykins.[11]

On September 21, 2009, Spotlight issued a check payable to PSCU in the amount of $15,596.56 to pay off the PSCU lien secured by the Vehicle.[12]  However, this check was dishonored for insufficient funds,[13] and the PSCU lien remained against the Vehicle.  The circumstances surrounding the failure to pay off the PSCU lien form the basis of Waknin's claims against Thomas.

In addition, the failure to satisfy the PSCU lien prevented the passage of clean title to Lykins.  Following his purchase of the Vehicle a series of events centering around the title gave rise to Lykins' claims against Thomas.  Before

---

[6]  Exhibit 6 (1st Bank "Cashier's Check" dated August 28, 2009).

[7]  Exhibit 7 ("Dealer's Bill of Sale for a Motor Vehicle" dated August 28, 2009) and Exhibit 8 ("Standard Sales Tax Receipt").

[8]  *See* Exhibit 2.

[9]  *See id.*

[10]  Transcript (Oct. 12, 2012), p. 77, line 25; p. 78, lines 1-6.

[11]  Transcript (Oct. 12, 2012), p. 78, lines 3-6.

[12]  Exhibit 3 (Spotlight check number 3867, dated September 21, 2009, payable to Public Service Credit Union in the amount of $15,596.56, signed by Teta).  No explanation was ever provided to this Court regarding the difference between the $15,596.56 payoff amount represented by the check from Spotlight (Exhibit 3), and the $15,960.20 payoff amount earmarked by Spotlight in the hand-written calculation of Waknin's net profit.  In the absence of any evidence to the contrary, and for the purposes of calculating damages, the Court must assume the actual PSCU lien payoff amount was the lesser amount of $15,596.56 because this was the amount of the bounced Spotlight check which was hand-delivered by Waknin to PSCU.

[13]  *See* Exhibit 32 (September 2009 Guaranty Bank statement).

the initial temporary registration was about to expire, on October 28, 2009, Glenn M. McColm, an employee of Spotlight, sent a facsimile transmission to the Colorado Department of Motor Vehicles requesting an extension of Lykins' temporary registration for the Vehicle.[14]  Specifically, McColm stated: "Please get an extension for Mr. Christopher Lykins on his 2002 Mercedes.  We apologize for the inconvenience to Mr. Lykins and for the extra work for the Dept. of Motor Vehicles. Spotlight Motors will have the title issue cleared up shortly."[15]  With this communication, Lykins obtained a motor vehicle tax receipt on November 5, 2009, which listed an expiration date of November 20, 2009,[16] and a Colorado Temporary Registration with the same expiration date.[17]  Later, Thomas delivered a third temporary registration to Lykins with an expiration date of December 23, 2009.[18]  By late December 2009, Spotlight had ceased operations.

On November 4, 2009, Waknin commenced litigation against Spotlight in Denver District Court, Case 09 CV 10346 ("State Court Action"), alleging, *inter alia*, breach of contract, breach of fiduciary duty, conversion, and violation of the Colorado consumer protection act.  Two months later, Lykins filed a complaint against Spotlight with the Colorado Department of Revenue, Auto Industry Division.  On March 5, 2010, Lykins requested permission to intervene in the State Court Action, and the state court granted Lykins' motion to intervene.  Later, the state court authorized Waknin to amend her complaint to implead Teta and Thomas individually, and plead additional claims.

On August 6, 2010, the state court entered an Order for Entry of Default Judgment in favor of Waknin and against Spotlight in the amount of $74,827.78 in the State Court Action.  However, the State Court Action claims against Teta and Thomas were stayed on their respective bankruptcy petition dates.

## B.    The Related Teta Adversary Proceeding.

On June 30, 2010, Teta and his spouse, Laura Anne Teta, filed a voluntary petition for Chapter 7 bankruptcy relief, Case No. 10-26493-MER.  On

---

[14]  Exhibit 12 (Spotlight Motors facsimile dated October 28, 2009).

[15]  Exhibit 12.

[16]  Exhibit 14 (motor vehicle tax receipt).

[17]  Exhibit 13 ("Colorado Temporary Registration" with expiration date of November 20, 2009).

[18]  Exhibit 15 ("Colorado Temporary Registration" with expiration date of December 23, 2009).

September 29, 2010, Lykins and Waknin commenced Adversary Proceeding No. 10-1706 MER against Teta by filing a Complaint containing virtually the same claims they now assert against Thomas (the "Teta Adversary"). Teta failed to file an answer or other responsive pleading. Upon Lykins and Waknin's request for a default judgment, and following an evidentiary hearing, this Court entered an order on June 16, 2011 determining Teta's debt to Plaintiffs is non-dischargeable under §§ 523(a)(2)(A), (a)(4) and (a)(6). The Court entered two judgments in favor of each Plaintiff, and both judgments are subject to a constructive trust.[19]

## C.    The Thomas Bankruptcy Case.

On November 8, 2010, Thomas and his spouse, Michelle Lynn Thomas, filed a voluntary petition for Chapter 7 bankruptcy relief. On January 25, 2011, the Plaintiffs filed their Complaint against Thomas (the "Thomas Adversary"). The allegations and claims for relief in the Complaint are identical to the claims set forth in the Teta Adversary, including the following: 1) fraudulent transfer under COLO. REV. STAT. § 38-8-101, *et seq.*; 2) *alter ego* doctrine under COLO. REV. STAT. § 7-80-107; 3) member liability under COLO. REV. STAT. § 7-80-606; 4) common law trustee doctrine; 5) violation of Colorado Consumer Protection Act under COLO. REV. STAT. § 6-1-105; 6) conversion/civil theft; 7) civil conspiracy as to civil theft; 8) fraud and fraud by check; 9) unjust enrichment; 10) nondischargeability under § 523(a)(2)(A); 11) nondischargeability under § 523(a)(4); and 12) nondischargeability under § 523(a)(6). Based on these claims, Plaintiffs requested a judgment for the following:

1)    money damages in an amount sufficient to compensate Plaintiffs fully for their injuries, damages and losses;

2)    treble damages pursuant to COLO. REV. STAT. §§ 18-4-405 and 6-1-113;

3)    reasonable attorney fees and costs pursuant to COLO. REV. STAT. §§ 18-4-405 and 6-1-113;

4)    prejudgment and post-judgment interest as allowed by law;

5)    an order finding Thomas' debts to the Plaintiffs are nondischargeable in their entirety; and

6)    such other relief this Court deems just and appropriate.

Unlike Teta, who failed to respond in the Teta Adversary, Thomas filed an Answer to the Complaint and defended the claims in this proceeding. Thomas generally denied all substantive allegations and raised the following affirmative defenses: 1) Plaintiffs' First, Second, Third, Fourth, Fifth, Sixth, Seventh and

---

[19] *Lykins and Waknin v. Teta (In re Teta)*, Slip Copy, 2011 WL 2435948 (Bank. D. Colo. 2011).

Ninth Claims for Relief fail to state a claim upon which this Court may grant relief; 2) this Court lacks jurisdiction over the subject matter on various claims asserted by Plaintiffs; 3) Plaintiffs cannot prove public impact necessary to prevail on their Fifth Claim for Relief; 4) Plaintiffs' First, Fifth, Sixth, Seventh, Eighth, Tenth, Eleventh and Twelfth Claims for Relief are barred by the express provisions of §§ 523(a)(2)(A), (4), and (6).

As of the date of the trial in this matter, the PSCU lien had still not been satisfied and Lykins had not received a certificate of title to the Vehicle.

## DISCUSSION

Although Plaintiffs brought identical claims against Thomas and Teta, the evidence in the Teta Adversary is not identical to the evidence presented in the Thomas Adversary. In this proceeding, the Court is limited to consideration of the record, admitted exhibits and trial testimony **from the Thomas Adversary**.[20] The Court notes the evidentiary discrepancy between this proceeding and the Teta Adversary to the extent the outcome varies, and highlights the following examples.

First, and most importantly, the Teta Adversary was not defended. As a result of the uncontroverted evidence in conjunction with Teta's failure to respond to the complaint in the Teta Adversary, this Court determined the Plaintiffs established their claims for relief against Teta by a preponderance of the evidence, and entered default judgment in favor of the Plaintiffs. Teta did not appeal, and Plaintiffs' judgment against Teta is final.

Second, in the Teta Adversary, the Court admitted a document titled "Spotlight Motors, LLC Cash Disbursements Journal" for the period of January 1, 2009 through December 31, 2009 (the "Journal"). Plaintiffs refer to the Journal in their joint written closing in the Thomas Adversary. However, the Journal was neither offered nor admitted in the Thomas Adversary, and the Court cannot consider the Journal as evidence in this proceeding. Plaintiffs' joint written closing also refers generally to Exhibits 4, 11, 16, and 19, which were also not admitted in the Thomas Adversary. Thus, the Court must also disregard any arguments made in connection with those four exhibits.

---

[20] *See Minutes of Proceedings* (Docket Nos. 72 and 81). During the course of trial, the Court admitted only Plaintiffs' Exhibits 1-3, 5-10, 12-15, 17-18, 20-37 and 40. The Court also took judicial notice of Mr. Thomas' 2009 tax return attached to his Schedules. In addition, the Court incorporates all findings of fact and conclusions of law from its previous Order dated March 26, 2012 (Docket No. 57), and the parties stipulated the undisputed facts as established for all purposes as set forth in that Order.

Third, the Court admitted the Operating Agreement in the Thomas Adversary, and this document was considered as evidence.  This document was previously unavailable in the Teta Adversary.

Finally, in the Teta Adversary, the Court considered Thomas' deposition transcript from his deposition held August 19, 2010, in connection with the State Court Action.  The deposition transcript was not admitted in the Thomas Adversary.  Rather, the Court heard live testimony at trial from Waknin, Lykins, Thomas, Teta, Chuck Haberstadt ("Haberstadt"),[21] Dion Cole, and Naomi Malek. The Court evaluated the credibility of these witnesses at trial.

The Court finds the testimony of Waknin, Lykins, Haberstadt, Mr. Cole and Ms. Malek credible.  The Court further finds Thomas was not a credible witness. The Court also notes Teta's lack of credibility, in large part due to his propensity to "bend in the wind," and to conform his testimony to each attorney's examination.  Mindful of the weight of such testimony, the Court concludes the evidence establishes the following in this proceeding.

## A.    Should the Corporate Veil of Spotlight Be Pierced?

Prior to addressing the nondischargeability claims under § 523, the Court must first determine whether the corporate veil of Spotlight should be pierced with respect to Thomas.[22]  The Plaintiffs, Thomas and Teta are all residents of Colorado, and Spotlight was formed under Colorado law.  The events at issue occurred in Colorado as well.  Thus, Colorado law on piercing the corporate veil applies to the instant matter.[23]

---

[21]  Haberstadt is an investigator with the Colorado Motor Vehicle Dealer Board and Auto Industry Division.

[22]  In the Teta Adversary, sufficient unrebutted evidence existed to conclude the corporate veil of Spotlight should be pierced as to Teta.  However, an independent analysis is appropriate with respect to Spotlight and Thomas.

[23]  COLO. REV. STAT. § 7-80-107, provides for the application of corporation case law to set aside limited liability as follows:

(1) In any case in which a party seeks to hold the members of a limited liability company personally responsible for the alleged improper actions of the limited liability company, the court shall apply  the case law which interprets the conditions and circumstances under which  the corporate veil of a corporation may be pierced under Colorado law.

(2) For purposes of this section, the failure of a limited liability company to observe the formalities or requirements relating to the management of its business and affairs is not in itself a ground for imposing personal liability on the

The Colorado Supreme Court summarized the veil-piercing doctrine as follows:

> Generally, a corporation is treated as a legal entity separate from its shareholders, thereby permitting shareholders to commit limited capital to the corporation with the assurance that they will have no personal liability for the corporation's debts.  Krendl & Krendl, *Piercing the Corporate Veil: Focusing The Inquiry*, 55 Den.L.J. 1 (1978).  When, however, the corporate structure is used so improperly that the continued recognition of the corporation as a separate legal entity would be unfair, the corporate entity may be disregarded and corporate principals held liable for the corporation's actions.  *Id.* at 2.  Thus, if it is shown that shareholders used the corporate entity as a mere instrumentality for the transaction of their own affairs without regard to separate and independent corporate existence, or for the purpose of defeating or evading important legislative policy, or in order to perpetrate a fraud or wrong on another, equity will permit the corporate form to be disregarded and will hold the shareholders personally responsible for the corporations improper actions.[24]

Veil-piercing remains the exception, not the rule, and the corporate veil will be pierced only in "extraordinary circumstances."[25]

Colorado law provides piercing the corporate veil "is appropriate when three elements are present: (1) the corporation was a mere *alter ego* of the shareholder, (2) the corporate structure was used to perpetrate a wrong, and (3) piercing the corporate veil would achieve an equitable result."[26]  "A claimant seeking to pierce the corporate veil must make a clear and convincing showing that each consideration has been met."[27]  Within this well established

---

members for liabilities of the limited liability company.

[24]  *Micciche v. Billings*, 727 P.2d 367, 372–73 (Colo. 1986); *see also Lowell Staats Min. Co., Inc. v. Pioneer Uravan, Inc.*, 878 F.2d 1259, 1262 (10th Cir. 1989) (quoting *Micciche*).

[25]  *Connolly v. Englewood Post No. 32 VFW, et al v. Phillips (In re Phillips)*, 139 P.3d 639, 644 (Colo. 2006) (citing *Leonard v. McMorris*, 63 P.3d 323, 330 (Colo. 2003) and *Water, Waste & Land, Inc. v. Lanham*, 955 P.2d 997, 1004 (Colo. 1998)).

[26]  *In re Burton*, 2010 WL 3422584, at *5 (10th Cir. BAP 2010) (unpublished decision).

[27]  *Phillips*, 139 P.3d at 644 (citing *Contractors Heating & Supply Co.*, 432 P.2d 237, 239 (Colo. 1967)).  *See also In re First Financial Services, LLC*, 2011 WL 2971841, at *7 (Bankr. D. Colo. July 21, 2011) (Slip Copy); *In re First Assured Warranty Corporation*, 383

framework, the Court will apply the three-part Colorado veil piercing test to the unique facts of this case.

1.    *Spotlight is an alter ego of Thomas.*

The first prong requires the Court to determine whether Spotlight was an *alter ego* of Thomas by examining certain factors. "While no one factor controls the analysis, a variety of considerations are used to determine whether the corporate form should be disregarded."[28]  As this Court previously discussed in *First Assured Warranty Corporation*:

> Under Colorado law, "[a]n alter-ego relationship exists when the corporation is a 'mere instrumentality for the transaction of the shareholders' own affairs, and there is such unity of interest in ownership that the separate personalities of the corporation and the owners no longer exist.'" *In re Phillips*, 139 P.3d 639, 644 (Colo. 2006) (citing *Krystkowiak v. W.O. Brisben Co., Inc.*, 90 P.3d 859, 867 n. 7 (Colo. 2004); *Gude v. City of Lakewood*, 636 P.2d 691, 697 (Colo. 1981)).
>
> In determining whether to disregard the corporate fiction and treat the corporation and shareholder as alter-egos, the Colorado Supreme Court has set forth several factors . . . including whether (1) the corporation is operated as a distinct business entity, (2) funds and assets are commingled, (3) adequate corporate records are maintained, (4) the nature and form of the entity's ownership and control facilitate misuse by an insider, (5) the business is thinly capitalized, (6) the corporation is used as a "mere shell," (7) shareholders disregard legal formalities, and (8) corporate funds or assets are used for noncorporate purposes. *In re Phillips*, 139 P.3d at 644 (citing *Leonard v. McMorris*, 63 P.3d 323, 330; *Newport Steel Corp. v. Thompson*, 757 F.Supp. 1152, 1156 (D. Colo. 1990)).[29]

"These factors reflect the underlying principle that the court should only pierce when the corporate form has been abused."[30]

---

B.R. 502, 527 (Bankr. D. Colo. 2008) (both relying on *Phillips*).

[28]  *Newport Steel Corp. v. Thompson*, 757 F. Supp. 1152, 1156-57 (D. Colo. 1990) (citing *Geringer v. Wildhorn Ranch, Inc.*, 706 F.Supp. 1442, 1449 (D. Colo. 1988)).

[29]  *In re First Assured Warranty Corporation*, 383 B.R. 502, 527 (Bankr. D. Colo. 2008).

[30]  *Phillips*, 139 P.3d at 644.

In support of their *alter ego* claim, Plaintiffs introduced several relevant documents including: (a) "Spotlight Motors, LLC's Outstanding Debt Breakdown" (the "Breakdown");[31] (b) Spotlight federal tax returns for the year 2008 (the "2008 Tax Return");[32] (c) Spotlight federal tax returns for the year 2009 (the "2009 Tax Return");[33] (d) Spotlight balance sheets, income statements and Guaranty Bank and Trust Company monthly bank account statements for the year 2009;[34] and (e) Spotlight formation documents, including the Articles of Organization, Organizational Resolution, and Operating Agreement.[35]

With respect to the *alter ego* factors, the Plaintiffs concede in their written closing the evidence fails to establish the first and second factors.  Indeed, the evidence shows Spotlight was set up as a Colorado limited liability company,[36] and there was no evidence to suggest Spotlight commingled funds and assets with those of Thomas.  Further, the Court did not hear evidence regarding the sixth factor (corporation is used as a "mere shell") or the eighth factor (corporate funds or assets are used for noncorporate purposes).  Accordingly, these factors were also not established in this case.

However, the Court finds the remaining factors demonstrate Spotlight is an *alter ego* of Thomas.  Specifically, regarding the third, fourth, fifth and seventh factors (whether adequate corporate records are maintained, whether the nature and form of the entity's ownership and control facilitate misuse by an insider, whether the business is thinly capitalized, and whether shareholders disregard legal formalities), the evidence weighs heavily in favor of piercing the corporate veil.

Thomas claims he did not know the Operating Agreement existed until the end of the first day of trial,[37] which alone supports the determination Thomas was unaware of the legal formalities required for the operation of Spotlight.  In

---

[31] Exhibit 20.

[32] Exhibit 22.

[33] Exhibit 23.

[34] Exhibits 24-35.

[35] Exhibit 40.

[36] Exhibit 40.

[37] The issues regarding the production of the Operating Agreement at the conclusion of the first day of trial will be addressed by separate order in connection with Plaintiffs' Motion for Sanctions (Docket No. 96), Thomas' Response (Docket No. 99) and Plaintiffs' Reply (Docket No. 100).

any event, Plaintiffs conclusively established Thomas (and Teta) disregarded the formal requirements under the Operating Agreement.  After the existence of the Operating Agreement came to light during trial, Thomas was unable to recall the existence or the substance of any provisions of the Operating Agreement,[38] including the following key provisions: holding annual meetings and keeping minutes, maintaining capital accounts, providing additional capital contributions versus company loans, manager guarantees, admitting new members, quorum and voting requirements, formal notice procedures and dissolution requirements.[39]

For example, during the first day of trial, Thomas stated informal board meetings were held and "[t]hings were written down[,]" but Thomas did not know the whereabouts of any minutes.[40]  Then, on the second day of trial, Thomas changed his position.  The following exchange at trial between Thomas and counsel for the Plaintiffs demonstrates Thomas' evasive and inconsistent testimony, and his complete lack of understanding with respect to annual meetings and keeping minutes:

> Q:  You didn't conduct any annual shareholder meetings, true?
> A:  There was two of us, Mr. Stengel.
> Q:  And these were the dinners that Mr. Teta referenced?
> A:  Yes, Mr. Stengel.
> Q:  And you took minutes of those meetings as a member?
> A:  Minutes between two people. Could have been some things written down. Certainly things were discussed but --
> Q:  So I want to make sure I'm clear. At that dinner annual meeting, you didn't take any minutes of that meeting, true?
> A:  Minutes are basically conversations or as much as I understand them. There were two of us again.
> Q:  There were two of you at the dinner?
> A:  No, our wives were there.
> Q:  So I want to make sure I'm clear. The annual meetings that you're referencing was a dinner with your wives at some particular point in time. Is that your testimony?
> A:  Yes.
> Q:  And it's your understanding that complies with the operating agreement that you executed?

---

[38]  Transcript (Oct. 12, 2012), p. 235, lines 10-17; p. 236, lines 4-5.

[39]  *See* Transcript (Oct. 12, 2012), p. 234-242; and Transcript (Feb. 13, 2013), p. 7-9 and p. 76-77; *see also* Exhibit 40.

[40]  Transcript (Oct. 12, 2012), p. 225, line 21; p. 226, lines 1-18.

A: To my knowledge, yes.[41]

In addition to failing to hold annual meetings or keep minutes, Thomas admitted he did not send formal notices of meetings.[42]  Thomas did not dissolve Spotlight with the unanimous written consent of both members as required under the Operating Agreement.[43]  Apparently, Thomas just filed a 2009 tax return for Spotlight, and closed the doors.  Further, Thomas was unaware of the overall membership structure of Spotlight.  Thomas read the Operating Agreement when Spotlight was formed, but as of the date of trial, Thomas could not recall and did not understand the content of the Operating Agreement.[44]

The evidence indicates an overwhelming disregard for legal formalities while operating Spotlight.[45]  Teta and Thomas provided inconsistent testimony regarding compliance with the formal requirements and record keeping, and the Court finds no credibility in Thomas' assertions that an annual dinner with their wives constituted the requisite annual board meeting.  Thomas could not remember his actual initial capital contribution of $50, testifying he contributed $100,000 when Spotlight was formed.  There is also a clear absence of written minutes and corporate documents.  The Court also notes the bare-bones, one-page, handwritten Consignment Agreement as further evidence Spotlight lacked corporate formalities and adequate documentation to support its transactions.[46]  Accordingly, the Court finds both the third and seventh of these factors weigh in favor of piercing the corporate veil.

With respect to the fourth factor, Thomas was the owner who was primarily responsible for the financial records of Spotlight.[47]  However, Thomas was unaware he was the registered agent of Spotlight[48] and stated most records were kept by a bookkeeper, not Thomas or Teta.  The Spotlight balance sheets fail to provide adequate detail as to the financial condition of Spotlight, and the

---

[41]  Transcript (Feb. 13, 2013), p. 76-77.

[42]  Transcript (Oct. 12, 2012), p. 239, lines 23-25; p. 240, lines 1-25; p. 241, line 1.

[43]  Transcript (Oct. 12, 2012), p. 241, lines 10-25; p. 242, lines 1-14.

[44]  Transcript (Oct. 12, 2012), p. 235, lines 1-15 ; p. 236 lines 4-5.

[45]  See Transcript (Oct. 12, 2012), p. 234-242; and Transcript (Feb. 13, 2013), p. 7-9 and p. 76-77.

[46]  See Exhibit 1.

[47]  Transcript (Oct. 12, 2012), p. 184, lines 14-17; p. 233, lines 3-13.

[48]  Transcript (Oct. 12, 2012), p. 232, lines 10-14.

Court is troubled with the Thomas' failure to remember the location of corporate documents and records.

Also, Thomas admitted Spotlight suffered from a cash crunch during 2009, and he regularly bounced checks from the Spotlight checking account during that year.  Despite his knowledge of Spotlight's severe financial distress, Thomas exercised his discretion and financial control to siphon funds earmarked for one purpose (*i.e.* paying off the PSCU lien against the Vehicle) to pay other bills of Spotlight.  While Thomas claimed his intent was to use whatever funds available pay Spotlights' creditors, the Court finds this testimony is not credible.  Thomas was complaisant with Teta's dealings with customers, and Thomas (and Teta) routinely took cash draws from Spotlight in 2009.  The "rob Peter to pay Paul" mentality culminated in Spotlight ceasing operations in late 2009, with the final income tax returns filed that year.  Although Teta never sold his 50% interest in Spotlight to Thomas,[49] Thomas filed the final tax return for Spotlight incorrectly listing himself as the sole owner.  Thomas was never the 100% owner of Spotlight.  These facts demonstrate Thomas' misuse of his financial control over Spotlight in the final days of the company's operation.  Thus, Plaintiffs showed Thomas, as the principal in control of Spotlight's finances, created an environment encouraging misuse by an insider, and the fourth factor has been established.

As to the fifth factor, the Court finds Spotlight was thinly capitalized.  A "cash crunch" does not establish whether a company is thinly capitalized.[50]  Rather, "[t]he obligation to provide adequate capital begins with incorporation and is a continuing obligation thereafter during the corporation's operations. . . . Inadequate capitalization means capitalization very small in relation to the nature of the business of the corporation and the risks the business necessarily entails."[51]  Here, Thomas and Teta did not loan money to Spotlight, and any cash put into Spotlight came in the form of their contributions.[52]  Thomas testified he initially contributed $100,000 at the formation of Spotlight, but had no paperwork evidencing such a contribution.  Thomas' recollection was directly belied by the Operation Agreement, which demonstrates Teta and Thomas only contributed a mere $50 each at the formation of Spotlight.[53]  After reading the applicable provision in the Operating Agreement, Thomas stated he had

---

[49] Transcript (Feb. 13, 2013), p. 23, lines 23-25; p. 24, lines 1-25; p. 25, lines 1-8.

[50] *See Newport Steel*, 757 F. Supp. at 1157 (citing *Lowell Staats*, 878 F.2d at 1263).

[51] *Lowell Staats*, 878 F.2d at 1263 (citations omitted).

[52] Transcript (Feb. 13, 2013), p. 15, lines 1-19.

[53] Exhibit 40, at p.18.

contributed additional capital after formation, but again offered no proof of such contributions.

Based on the monthly Spotlight balance sheets for the period of January 2009 through August 2009, it appears Thomas made two capital contributions in the aggregate amount of $5,850 ($4,675 in March 2009, plus $1,175 in April 2009).[54]  However, over the same period, the balance sheets reveal Thomas took a total of $10,857.52 in draws from Spotlight.[55]  Moreover, the balance sheets show the total negative capital of -$70,135.96 in January 2009 declined to -$122,936.49 by August 2009.[56]  Accordingly, the Court finds Spotlight was thinly capitalized during the relevant time period given the risks associated with a used car dealership business.  Therefore, Plaintiffs satisfied this factor as well.

As the U.S. Court of Appeals for the Tenth Circuit concluded, "we do not determine the winner by a numerical score, as in a ball game. We must view all the factors . . . taken as a whole with due regard to the extent to which they were and were not fully satisfied . . . ."[57]  Based on the specific facts of this case as applied to the *alter ego* factors, the Court concludes Plaintiffs have established by clear and convincing evidence Spotlight is an *alter ego* of Thomas.

> 2.    *Justice Requires Recognizing Substance of the Relationship Between Thomas and Spotlight Over the Form.*

The second and third elements require the Court to examine two additional equitable considerations:

> Secondarily, a court should determine whether "justice requires recognizing the substance of the relationship between the shareholder and corporation over the form because the corporate fiction was 'used to perpetrate a fraud or defeat a rightful claim.'"  *Id.*  Finally, the court should determine if an equitable result will be achieved by disregarding the corporate veil.  *Id.*[58]

---

[54]  *See* Exhibits 24 through 31.

[55]  *See id.*

[56]  *See id.*

[57]  *Boughton v. Cotter Corp.*, 65 F.3d 823, 838 (10th Cir. 1995) (applying a broader list of *alter ego* factors in the veil-piercing context of a corporate parent and its subsidiary).

[58]  *First Assured*, 383 B.R. at 527 (citing *Phillips*, 139 P.3d at 644).

With respect to the second prong, "[o]nly when the corporate form was used to shield a dominant shareholder's improprieties may the veil be pierced."[59]  As set forth above, several of the above-mentioned documents were introduced to show Spotlight had no income or very little income during the relevant time period, that Spotlight repeatedly issued insufficient funds checks, and that Teta and Thomas took distributions or draws rather than paying Lykins, Waknin, or PSCU.  Viewing all evidence in this case as a whole, combined with Thomas' and Teta's lack of credibility, this Court finds Thomas' disregard of the separateness of the corporate identity caused an injustice and inequity to the Plaintiffs, warranting piercing the corporate veil.

In addition, Spotlight's 2008 Tax Return shows gross sales of $5,398,246, but ordinary business income of only $5,075 after costs and deductions.[60] Spotlight's 2009 Tax Return shows gross sales of $1,975,451, and ordinary business loss of -$36,830 (no income) after costs and deductions.[61]

Spotlight's checking account statements show Spotlight had a "beginning balance" on June 1, 2009 (the month before Waknin consigned her Vehicle) of $10,669.42, deposits and miscellaneous credits of $222,997.84, withdrawals and miscellaneous debits of $228,368.51, and an "ending balance" on June 30, 2009 of $5,298.75.[62]  During June 2009, Guaranty Bank sent a "Notice of Non-Sufficient Funds" to Spotlight regarding approximately ten of Spotlight's checks.[63]

Spotlight's checking account statements further show Spotlight had a "beginning balance" on July 1, 2009 (the month Waknin consigned her Vehicle) of $5,298.75, deposits and miscellaneous credits of $210,829.20, withdrawals and miscellaneous debits of $210,387.41, and an "ending balance" on July 31, 2009 of $5,740.54.[64]  During July 2009, Guaranty Bank sent a "Notice of Non-Sufficient Funds" to Spotlight regarding approximately eighteen of Spotlight's checks.[65]

---

[59] *Phillips*, 139 P.3d at 644.

[60] Exhibit 22.

[61] Exhibit 23.

[62] Exhibit 29.

[63] Exhibit 29.

[64] Exhibit 30 (July 2009 statement).

[65] Exhibit 30 (July 2009 statement).

On August 1, 2009 (the month Lykins purchased the Vehicle), the checking account statements indicate Spotlight had a "beginning balance" of $5,740.54, deposits and miscellaneous credits of $216,381.27, withdrawals and miscellaneous debits of $218,756.73, and an "ending balance" on August 31, 2009 of $3,365.08.[66]  During August 2009, Guaranty Bank sent a "Notice of Non-Sufficient Funds" to Spotlight regarding approximately thirty-one of Spotlight's checks.[67]

Lastly, Spotlight's checking account statements show Spotlight had a "beginning balance" on September 1, 2009 (the month Teta issued the Spotlight check payable to Public Service Credit Union in the amount of $15,596.56) of $3,365.08, deposits and miscellaneous credits of $220,986.46, withdrawals and miscellaneous debits of $223,885.27, and an "ending balance" on September 30, 2009 of $466.27.[68]  During September 2009, Guaranty Bank sent a "Notice of Non-Sufficient Funds" to Spotlight regarding approximately twenty-six of Spotlight's checks, including the check to pay off Waknin's lien.[69]

Thomas, not Teta, exercised control over the financial element of Spotlight.  As a result, Thomas should be held accountable for his financial "gamesmanship" as well as the similar conduct of Spotlight and its employees.  Therefore, in considering all evidence and in light of the nature of Plaintiffs' claims against Thomas, the Court finds "justice requires recognizing the substance of the relationship between the [member] and [limited liability company] over the form because the corporate fiction was 'used to perpetrate a fraud or defeat a rightful claim.'"[70]

> 3.     *Piercing the Corporate Veil of Spotlight Will Achieve an Equitable Result.*

Third, the court must evaluate whether an equitable result will be achieved by disregarding the corporate form and holding the shareholder personally liable for the acts of the business entity. *Water,*

---

[66]  Exhibit 31 (August 2009 statement).

[67]  Exhibit 31 (August 2009 statement).

[68]  Exhibit 32 (September 2009 statement).

[69]  Exhibit 32 (September 2009 statement); Exhibit 3 (Spotlight check number 3867, dated September 21, 2009, payable to Public Service Credit Union in the amount of $15,596.56, signed by Teta).

[70]  *First Assured*, 383 B.R. at 527 (quoting *Phillips*, 139 P.3d at 644).

*Waste & Land, Inc.*, 955 P.2d at 1004.  Achieving an equitable result is the paramount goal of traditional piercing of the corporate veil.[71]

In addition to the Court's analysis of the factors identified above, "an equitable result will be achieved by disregarding the corporate veil."[72]  Spotlight ceased operations in 2009 and is no longer operating.  While Plaintiffs hold a judgment against a now non-operating Spotlight, and a non-dischargeable judgment against Teta, the Plaintiffs also seek redress against Thomas.  This proceeding represents the final round of litigation implicating Thomas in the wrongs perpetuate by Spotlight, Teta and other Spotlight employees.  In this Court's view, holding Thomas liable for the conduct of Spotlight would achieve an equitable result.

Plaintiffs have met their burden of proof on the veil-piercing theory, and the Court determines piercing the corporate veil of Spotlight is appropriate in this matter.  As a result, the claims asserted by Plaintiffs are valid claims against Thomas individually.

**B.     Claims for Relief Under § 523(a)(2)(A)**

Section 523(a)(2)(A) states in relevant part:

(a)  A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--

. . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . .

Section 523(a) exceptions to discharge must be "narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in

---

[71]  *Phillips*, 139 P.3d at 644.

[72]  *First Assured*, 383 B.R. at 527 (quoting *Phillips*, 139 P.3d at 644).

the debtor's favor."[73]   The claimant bears the burden of proving nondischargeability under § 523(a) by a preponderance of the evidence.[74]

In his initial bankruptcy filing, Thomas lists unsecured business debts owed to both Waknin and Lykins.  Thomas did not indicate the debts were contingent, unliquidated or disputed, and Thomas never amended his Schedule F.  Thus, Thomas admits the existence of these debts.

A claimant may sustain a claim under § 523(a)(2)(A) by proving false pretenses, false representation or actual fraud, and these three independent causes of action require proof of different elements.[75]   The Bankruptcy Appellate Panel for the Tenth Circuit explained the § 523(a)(2)(A) framework as follows:

> To sustain a claim for false representation under Section 523(a)(2)(A), the claimant must prove by a preponderance of the evidence that: 1) the debtor made a false representation; 2) with the intent to deceive the creditor; 3) the creditor relied on the false representation; 4) the creditor's reliance was [justifiable]; and 5) the creditor was damaged as a result.  *Fowler Bros v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996).  Intent to deceive can be inferred from the totality of the circumstances.  *Copper v. Lemke (In re Lemke)*, 423 B.R. 917, 922 (10th Cir. BAP 2010) (citing *Young*, 91 F.3d at 1375).
>
> False pretenses under Section 523(a)(2)(A) are implied misrepresentations intended to create and foster a false impression. . . . False pretenses can be "defined as any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor." *Stevens v. Antonious (In re Antonious)*, 358 B.R. 172, 182 (Bankr. E.D. Pa. 2006) (citing *Rezin v. Barr (In re Barr)*, 194 B.R. 1009, 1019 (Bankr. N.D. Ill. 1996)).

---

[73]   *Oklahoma Dep't of Sec., ex. rel. Faught v. Wilcox*, 691 F.3d 1171, 1174 (10th Cir. 2012) (citing *In re Sandoval*, 541 F.3d 997, 1001 (10th Cir. 2008)).

[74]   *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991).

[75]   *Bank of Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 222-223 (10th Cir. BAP 2013); *see also Diamond v. Vickery (In re Vickery)*, 488 B.R. 680, 691 (10th Cir. BAP March 13, 2013), *appeal docketed*, No. 13–1148  (10th Cir. April 11, 2013) (recognizing "[i]n order to give full effect to the plain meaning of the disjunctive 'or' in § 523(a)(2)(A), we conclude that 'actual fraud' is an independent basis for nondischargeability under that subsection.").

> A claimant may also sustain a claim under Section 523(a)(2)(A) by proving that the debtor engaged in actual fraud. . . . Actual fraud occurs "when a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right." *Id.* at 690 (quoting *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (6th Cir. BAP 2001)).[76]

While the elements for each theory under § 523(a)(2)(A) differ, the common thread is a debtor's intent to defraud a creditor.

Here, Plaintiffs did not separate the distinct elements for false pretenses, false representation and actual fraud. The Complaint simply states, "[T]he Debts Defendant Thomas owes to the Plaintiffs, as described in this complaint, are non-dischargeable pursuant to 11 U.S.C § 523(a)(2)(A), because the debts are from money obtained by false pretenses, false representations and/or actual fraud."[77] Following trial, Plaintiffs' argue for relief under the general umbrella of § 523(a)(2)(A), applying only the *Young* elements for false representation. Neither the Complaint nor Plaintiffs' written closing contain any argument supporting the distinct elements under § 523(a)(2)(A) for actual fraud or false pretenses. Therefore, the Court finds Plaintiffs waived such claims, but even if such claims were not waived, Plaintiffs did not present sufficient evidence at trial supporting such claims. Accordingly, Plaintiffs' claims for false representation are their only potential avenue for success under § 523(a)(2)(A).

To establish a nondischargeable claim for a false representation under § 523(a)(2)(A), Plaintiffs must each establish the following elements by a preponderance of the evidence:

- the debtor made a false representation of fact;
- the fact was material;
- the debtor made the representation knowing it to be false;
- the debtor made the representation intending the creditor's reliance;
- the creditor relied upon the representation;
- the reliance was justifiable; and
- the reliance resulted in damage to the creditor.[78]

---

[76] *Id.*

[77] Complaint, at ¶ 101.

[78] *Field v. Mans*, 516 U.S. 59, 70 (1995); *Fowler Brothers v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996); *Martino v. First Citizens Bank & Trust Co. (In re Martino)*, 2012 WL 1945424, at *2 (Bankr. D. Colo. 2012) (slip copy).

1.      *Waknin's Claim for Alleged False Representations*

After entering into the Consignment Agreement with Spotlight, Waknin was informed there had been an offer on her Vehicle.  Therefore, she went to the Spotlight office to accept the offer and sign the necessary paperwork.  Waknin received $1,504.80 profit from the sale of the Vehicle to Lykins, but did not receive the balance necessary to pay off her lien with PSCU.  Rather, Teta told Waknin he would send those funds directly to PSCU to pay off the lien.  Based on this representation, Waknin accepted the offer to sell the Vehicle and signed the necessary paperwork.

About one week later, PSCU contacted Waknin inquiring about her outstanding monthly car payment.  She explained the Vehicle was sold and her understanding was Spotlight was handling the payoff of the lien.  After another week passed, PSCU called Waknin again asking about her car payment.  She provided the same explanation and then contacted Teta.  Teta told Waknin he sent the check to PSCU, but continued to provide excuses for why such lien had not yet been paid off, including a delay due to the Labor Day holiday or that the payment was "caught up in paperwork" or "lost in the mail."  Waknin believed Teta that the lien would be paid directly by Spotlight.  A couple weeks later, Waknin received a third call from PSCU and learned PSCU never received any funds from Spotlight or Teta.  At this point, Waknin confronted Teta and directed him to stop payment on the check allegedly sent by Spotlight to PSCU.  Instead, Waknin offered to stop by Spotlight in person to pick up a new check and deliver it to PSCU herself.

Indeed, Waknin met with Teta at Spotlight, and obtained a check issued by Spotlight in the amount of $15,596.56.  Waknin hand delivered the check to PSCU.  She believed the lien against the Vehicle had been paid in full, but later learned from PSCU the check was returned for non-sufficient funds.[79]

Thereafter, Waknin continued to leave telephone messages for Teta and Thomas at Spotlight, but never received a return phone call or satisfactory explanation regarding the funds.  When Waknin returned to Spotlight to confront Teta and Thomas, the dealership had ceased operations.  Waknin eventually retained a lawyer to pursue the matter.

After the Spotlight check bounced, Waknin made some additional payments to PSCU in an attempt to maintain a positive credit rating.  However, Waknin eventually stopped making monthly payments.  As a result of the unsatisfied lien, Waknin has received calls from repossession companies and collection agencies, PSCU sued Waknin for damages, PSCU attempted to recover

---

[79]  Exhibits 3 and 32.

the Vehicle from her property, and Waknin's credit score has fallen from 805 to 300.  As of the date trial in this proceeding concluded, the PSCU lien on the Vehicle has still not been satisfied.

Based upon this evidence, the Court finds Waknin has established a claim under § 523(a)(2)(A) against Thomas.[80]  Although Waknin's dealings regarding the Consignment Agreement and the bounced Spotlight check involved Teta, not Thomas, the named parties to the Consignment Agreement were Waknin and Spotlight.  As set forth below, Spotlight is liable for the amount of the PSCU lien.  Thus, the Court finds Thomas is liable for the same.

Thomas testified he was primarily responsible for the financial records of Spotlight.[81]  Thomas further stated that an entity who received a check from Spotlight would have had a reasonable expectation the check would be paid.[82]  However, during 2009, Thomas regularly signed checks from the Spotlight business account that were returned for insufficient funds.[83]  The instant matter is akin to a classic "robbing Peter to pay Paul" Ponzi scheme, where Thomas used funds earmarked to pay off the PSCU lien to pay other Spotlight obligations, leaving the Plaintiffs "holding the bag."  Specifically, the certified funds tendered by Lykins were deposited into the Spotlight business account, and Thomas agreed Spotlight was obligated to pay off the PSCU lien.[84]  However, Thomas admitted those funds were not used to pay off the lien against the Vehicle, but rather Thomas diverted the funds to pay other Spotlight "business expenditures."[85]  Thomas' control of Spotlight's finances indicate he was aware Spotlight was applying funds that should have been used to pay off the PSCU lien to pay other, unrelated Spotlight expenses.

Thus, each of the *Young* elements are satisfied with respect to the representation Spotlight would pay off the PSCU lien.  First, Teta, in his capacity as an owner of Spotlight, made a false representation to Waknin that Spotlight would pay off her lien on the Vehicle by making payment directly to PSCU.  This

---

[80]  The Court recognizes that but for piercing the corporate veil, Waknin would not have a cognizable claim against Thomas.  However, as set forth herein, the Court finds piercing the corporate veil of Spotlight is proper on the facts of this case.

[81]  Transcript (Oct. 12, 2012), p. 184, lines 17-19.

[82]  *See* Transcript (Oct. 12, 2012), p. 206-207.

[83]  *See* Transcript (Oct. 12, 2012), p. 195-206; and Exhibits 25-35.

[84]  Transcript (Oct. 12, 2012), p. 186, lines 10-18.

[85]  Transcript (Oct. 12, 2012), p. 208-210.

representation was false.  Second, the representation was made with the intent to deceive Waknin, as evidenced by Spotlight's history of bounced checks during 2009 and Spotlight's continuing false statements regarding the payoff of the lien.  Third, Waknin relied on the representations, as shown by her signing the necessary paperwork to sell the Vehicle.[86]  Fourth, Waknin's reliance was justifiable because Spotlight and Teta made representations typical of a car dealership.  Finally, such false representations of Spotlight's intention to pay off the lien caused Waknin to sustain losses, demonstrated by the unpaid lien, ongoing litigation between PSCU and Waknin, damage to Waknin's credit score and Waknin's repeated correspondence with PSCU, and  repossession and collection companies.

Therefore, based on the totality of the circumstances, the Court finds Spotlight, through Teta, knowingly made false representations to Waknin regarding payment of the PSCU lien, and the evidence demonstrates Spotlight intended to deceive Waknin.  Further, Waknin's reliance on these repeated representations was justifiable, and resulted in proven damages.  Spotlight was obligated to payoff the lien, and failed to do so.  Given his direct involvement in the financial affairs of Spotlight, and his personal liability for Spotlight's obligations, the Court concludes Waknin has satisfied her burden of proof for false representation under § 523(a)(2)(A), and the debt owed to Waknin is excepted from Thomas' discharge.

The Court finds Waknin has established damages in the amount of $15,596.56 for the funds withheld from the sale of the Vehicle (i.e. the amount of the dishonored check and payoff of the lien at PSCU).  Waknin offered no

---

[86]  As noted by Chief Judge Howard R. Tallman of this Court,

The *Fowler Bros.* Court used the term "reasonable" reliance, but the Supreme Court has held that § 523(a)(2)(A) requires justifiable, and not reasonable, reliance in the case of *Field v. Mans*, 516 U.S. 59, 74, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).  This Court will apply that standard rather than the reasonable reliance standard articulated in *Fowler Bros. v. Young*.  In order for the Plaintiff to have justifiable reliance on a representation under 11 U.S.C. § 523(a)(2)(A), the Plaintiff need only perform a cursory inspection of the representation to the extent that it should be very obvious that the representation is fraudulent.  *Field v. Mans*, 516 U.S. 59, 71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).  Justifiable reliance is not reasonable reliance, so the objective reasonable person standard does not apply; it is merely what a cursory examination of the representation would uncover.  *Id.* at 72, 116 S.Ct. 437.

*Adams County Dept. of Soc. Servs. v. Sutherland-Minor (In re Sutherland-Minor)*, 345 B.R. 348, 354, n.4 (Bankr. D. Colo. 2006).  *See also Fowler Brothers*, 91 F.3d at 1373 and *Field v. Mans*, 516 U.S. at 74.

other concrete figures establishing additional damages in this proceeding, and it was her burden to do so at trial.  While Waknin requested additional damages for insurance and debt servicing payments, she offered no documentation or testimony substantiating these figures.  Thus, her damages are limited to $15,596.56 and this debt is excepted from Thomas' discharge pursuant to § 523(a)(2)(A).  Following its discussion of other claims, the Court will address Waknin's request for treble damages, interest, and attorneys' fees.

### 2.    *Lykins' Claim for Alleged False Representation*

Lykins testified he found the Vehicle on a car website, contacted Spotlight, and originally spoke to Thomas regarding the Vehicle.  Lykins test-drove the Vehicle on Spotlight's lot on August 28, 2009, and negotiated his purchase of the Vehicle in person with Thomas.  Lykins obtained a cashier's check for $21,382.42,[87] and tendered the cashier's check to Thomas to purchase the Vehicle on the same day.  After filling out all the paperwork with Thomas, Lykins received a temporary permit for a license plate, and drove the Vehicle home.

Lykins believed he would receive an actual certificate of title with forty-five days, the deadline set forth on the first temporary permit.  However, as the forty-five day deadline approached without any contact from the dealership, he called Spotlight and spoke to Thomas.  Thomas represented to Lykins "there had been a mix-up on the title, [and] that the previous owner had signed the title incorrectly . . . and that they were in the process of getting a replacement title from the state and [it] would take approximately six weeks."[88]  Lykins relied on Thomas' representation, which representation was false because the delay was caused by the failure to pay off the PSCU lien, not a "mix-up" with the title from Waknin.

To ease Lykins' concern regarding the impending expiration of the first temporary permit, Thomas promised to send documentation extending the time to allow Lykins to continue driving the Vehicle.  Mr. McColm provided Lykins with a copy of the facsimile transmission to the Colorado Department of Motor Vehicles requesting an extension of Lykins' temporary registration for the Vehicle.[89]  Lykins took the facsimile to the Department of Motor Vehicles, purchased a new temporary registration sticker, and received a motor vehicle

---

[87]  Exhibit 6.

[88]  Transcript (Oct. 12, 2012), p. 118, lines 22-24; p. 119, lines 9-12.  The Court notes Thomas testified he could not recall any conversations with Lykins, lending to the finding Thomas is not a credible witness.

[89]  Exhibit 12.

tax receipt with a fifteen day extension.[90]  Lykins also received a Colorado Temporary Registration with the same expiration date of November 20, 2009.[91]

In December 2009, Lykins' second temporary registration expired and Lykins called Spotlight again because he was unable to drive the Vehicle without a valid registration.  According to Lykins, Thomas responded "they were still working on the title issue.  Now the issue was that the previous owner was holding the title "hostage" because she wanted more money."[92]  This representation to Lykins was also false.  At this point, Waknin had received her profit from the sale of the Vehicle, and two months earlier had hand-delivered the bounced check to PSCU.  Her only issue was getting the lien paid, which Spotlight had failed to do.  The Court also notes this was the first time Lykins had any indication another owner or person was involved in the transaction because he was not previously told the Vehicle was consigned to Spotlight.

With the second extension about to expire, Thomas told Lykins he would provide a third temporary registration to Lykins.  Thomas delivered a third temporary registration sticker to Lykins at his home, with an expiration date of December 23, 2009.[93]  As the final extension began to expire, Lykins repeatedly called Thomas and Teta.  He was met mostly with voicemail, but on some occasions he reached Thomas who would hang up after Lykins identified himself As a last resort, Lykins drove to Spotlight in late December, but Spotlight had closed it doors and ceased operating.  Lykins never received a valid title for the Vehicle.

Based on these facts, the Court finds Lykins has established a claim under § 523(a)(2)(A) as follows.  First, Thomas made a false representation to Lykins by representing he would deliver title to the Vehicle in exchange for Lykins' payment in full, in cash.  Further, Thomas failed to inform Lykins the Vehicle was subject to the Consignment Agreement and PSCU lien. Second, Thomas made the representations and omissions with the intent to deceive Lykins, as evidenced by Thomas' continuing false statements regarding the delay in producing the title. Third, Lykins relied on the representations and omissions, as demonstrated by his paying for the Vehicle in full, in cash. Fourth, Lykins' reliance was justifiable because Thomas and other representatives of Spotlight

---

[90]  Exhibit 14 (motor vehicle tax receipt).

[91]  Exhibit 13 ("Colorado Temporary Registration" with expiration date of November 20, 2009).

[92]  Transcript (Oct. 12, 2012), p. 123, lines 20-22.

[93]  Exhibit 15 ("Colorado Temporary Registration" with expiration date of December 23, 2009).

made representations typical of a car dealership and regarding the sale of a vehicle.  Further, such reliance on obtaining title is consistent with Colorado law, including COLO. REV. STAT. § 42-6-112.  Finally, Thomas' representations caused Lykins to sustain a loss, as shown by the fact he still has not obtained title to the Vehicle and has incurred storage and insurance costs for a Vehicle he is unable to drive legally.

The Court finds Lykins has established damages for the failure to obtain clean title on his Vehicle.  However, allowing Lykins to retain the Vehicle and recover the price he paid for the Vehicle ($21,382.42), plus allowing Waknin to recover $15,596.56 to pay off the lien, potentially leads to a double recovery. This issue will be discussed below. The Court cannot award Lykins the amount requested for automobile repairs, $1,623.45, as the evidence before the Court shows the Vehicle was purchased "as is" and there were no allegations Spotlight, Teta or Thomas misrepresented the condition of the Vehicle.  Lykins also requested $4,800.00 for insured secured storage, but Lykins did not provide any testimony or documents supporting this amounts.  Thus, the Court cannot award him costs for insured secured storage in this proceeding. The Court will address Lykins' request for treble damages, interest, and attorney fees below.

## B.    Claims for Relief Under § 523(a)(4).

Pursuant to § 523(a)(4), "(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."[94]  In their Complaint, Plaintiffs allege generally the debts are nondischargeable under § 523(a)(4), "because the debts arose from fraud or defalcation while acting in a fiduciary capacity, embezzlement and/or larceny."[95]  However, Plaintiffs did not present any evidence of a fiduciary relationship between Plaintiffs and Thomas.  The mere existence of the commercial transactions that took place between Waknin and Spotlight and Lykins and Spotlight are insufficient to establish a fiduciary relationship under § 523(a)(4).  The Consignment Agreement (which would only be applicable to Waknin) is likewise insufficient to establish a trust or fiduciary relationship required under § 523(a)(4).[96]

---

[94]  § 523(a)(4).

[95]  Complaint, ¶ 103.

[96]  The Bankruptcy Court for the Western District of Tennessee summarized the general rule regarding consignment agreements and § 523(a)(4), under similar facts:

Courts generally require that in order for a fiduciary relationship to exist when there is a consignment, the consignment proceeds must be segregated and must

Accordingly, Plaintiffs cannot prevail on a claim for fraud or defalcation while acting in a fiduciary capacity.

However, "Section 523(a)(4) does not require the existence of a fiduciary relationship in order to establish that a debt created by acts of embezzlement or larceny is nondischargeable in bankruptcy."[97]  The difference between embezzlement and larceny has been explained as follows:

> Embezzlement has been defined under § 523(a)(4) as "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *In re Spector*, 133 B.R. 733, 741 (Bkrtcy. E.D. Pa. 1991); *see also In re Crosswhite*, 91 B.R. 156, 159 (Bkrtcy. M.D. Fla. 1988).  The Debtor paid other suppliers from the proceeds of jewelry consigned by Plaintiff.  This amounts to an appropriation of property, which, as discussed above, was fraudulent. **If the Debtor had obtained the property lawfully, then her acts constitute embezzlement; if she obtained it with fraudulent intent, larceny.**  *See Spector*, 133 B.R. at 741 (larceny differs from embezzlement only in the fact that

---

not be available for the consignees general use.  *In re Sutton* at 394; *see also Hurlbert v. Drake*, 5 B.R. 149 (Bankr. D. Idaho 1980); *DL & B Oil Company v. Dawson*, 16 B.R. 343 (Bankr. N.D. Ill. 1982).  In this case, there was no evidence that the proceeds of the sale of the watch were segregated, and there was no evidence presented that the parties even intended that the proceeds were to be segregated.  Therefore only a debtor-creditor relationship existed, as opposed to a trust relationship.  *See In re Farrell & Howard Auctioneers, Inc.*, 172 B.R. 712 (Bankr. D. Mass. 1994). Although it is undisputed that Mr. Smallwood never actually received payment for the watch, and although a court, as a matter of equity, could find that an implied trust existed, the fact remains that the parties' consignment relationship did not rise to the level of an express trust as required by § 523(a)(4).  Because the court finds that no fiduciary relationship existed it is unnecessary for this court to determine whether fraud or defalcation occurred.

*Smallwood v. Howell (In re Howell)*, 178 B.R. 730, 733 (Bankr. W.D. Tenn. 1995).  *See also Freer v. Beetler (In re Beetler)*, 368 B.R. 720 (Bankr. C.D. Ill. 2007); *Royster-Clark Agribusiness v. Mask (In re Mask)*, 2007 WL 7138339, *3 (Bankr. N.D. Ga. 2007); *Oklahoma Dept. Of Wildlife Conservation v. Perryman (In re Perryman)*, 191 B.R. 196, 199 (E.D. Okl. 1996); *Bacon v. Hyers (Matter of Hyers)*, 70 B.R. 764, 771 (Bankr. M.D. Fla. 1987); and *Snap-On Tools Corp. v. Rigsby (In re Rigsby)*, 18 B.R. 518 (Bankr. Va. 1982).

[97]  *Rigsby*, 18 B.R. at 520.  *See also Bryant v. Lynch (In re Lynch)*, 315 B.R. 173, 175 (Bankr. D. Colo. 2004) ("A claim for nondischargeability under Section 523(a)(4) may rest on proof of larceny or embezzlement, without requiring proof of a fiduciary relationship.").

the felonious intent existed at the time of the taking).  In either case, the debt falls within the § 523(a)(4) exception.[98]

Under this definition, Plaintiffs failed to demonstrate Thomas or Spotlight unlawfully obtained property of the Plaintiffs with fraudulent intent.  Rather, Spotlight obtained the Vehicle from Waknin lawfully under the terms of the consensual Consignment Agreement.[99]  Thomas obtained the cashiers' check from Lykins lawfully under the terms of the Buyers Order and Invoice.[100]  Therefore, Plaintiffs' claim under § 523(a)(4) for larceny must fail.

However, the Court finds sufficient evidence Spotlight embezzled the Vehicle (or its proceeds) from Waknin, and Thomas embezzled the certified funds from Lykins.[101]  Specifically, Spotlight obtained the Vehicle from Waknin lawfully, but then embezzled the Vehicle (or the proceeds) by fraudulently converting such property to Spotlight's own use without Waknin's consent.  Similarly, Thomas obtained the cashier's check from Lykins lawfully for the benefit of Spotlight, but then embezzled such funds by fraudulently converting such property to Spotlight's own use without delivering title to Lykins, and

---

[98]  *Theo Walter Co. v. Nathan (In re Nathan)*, 1993 WL 300054, *5 (Bankr. S.D. Fla. 1993) (not reported in B.R.) (emphasis added).  *See also Lynch*, 315 B.R. at 179 ("The courts define embezzlement and larceny as having the same elements, with the one distinction that, with larceny, the original taking and possession of property was unlawful rather than authorized.").  *See also Hartwig v. Markley (In re Markley)*, 446 B.R. 484, 489 (Bankr. D. Kan. 2011) ("Embezzlement requires allegations of misappropriation of property of another by a person in whom said property was lawfully entrusted for a specific purpose. Larceny is misappropriation of property of another by theft.").

[99]  Exhibit 1.

[100]  Exhibits 5 and 6.

[101]  *See Tague & Beem, P.C. v. Tague (In re Tague)*, 137 B.R. 495, 500 (Bankr. D. Colo. 1991) wherein the Bankruptcy Court for the District of Colorado addressed theft and fraud in the context of §§ 523(a)(2) and (a)(4):

> Under Colorado case law, conversion is held sufficient for purposes of theft prosecution. *See Hucal v. People*, 176 Colo. 529, 534, 493 P.2d 23 (1971). *See also McGuire v. People*, 83 Colo. 154, 262 P. 1015 (1928) (failure to pay over money collected for another is conversion).  Where theft is premised on deception under Section 18-4-401, C.R.S., the requisite mental state, an intent to defraud, must be established by proof that intentional misrepresentations were made to the victim which caused him to part with something of value in reliance on those misrepresentations.  *See People v. Norman*, 703 P.2d 1261 (Colo.1985); *People v. Warner*, 801 P.2d 1187 (Colo.1990).  Similar standards apply to the pleading and proof of actual fraud under Section 523(a)(2) and (a)(4). *See In re Mullet, supra; In re Black, supra.*

without Lykins' consent.  Such debts are therefore excepted from Thomas' discharge under § 523(a)(4) because the debts were created by acts of embezzlement.

As under the § 523(a)(2)(A) claim, the Court finds Waknin has established damages in the amount of $15,596.56 for the funds withheld from the sale of the Vehicle (i.e. the amount of the dishonored check and payoff of the lien at PSCU). Such debt is excepted from Thomas' discharge pursuant to § 523(a)(4).  The Court finds Lykins has also established damages under § 523(a)(4).  However, the double recovery issues identified above remain and will be addressed below.

**D.     Claims for Relief Under § 523(a)(6).**

In their Complaint, Plaintiffs allege the debts are nondischargeable under § 523(a)(6), "because the debts arose from willful and malicious injury by the Defendant Thomas to the property of Plaintiffs."[102]  The Tenth Circuit Bankruptcy Appellate Panel has stated the following regarding § 523(a)(6):

> Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."  To state a claim for relief under § 523(a)(6), the creditor must include allegations that would support a reasonable inference that the debtor caused a deliberate or intentional injury to the creditor. Debts resulting from recklessness or negligence do not fall within § 523(a)(6).

> . . .

> [A]s the Supreme Court made clear in *Kawaauhau v. Geiger*, an intent to cause injury is required to bring a debt within § 523(a)(6).  Since a person can convert property without intending to injure the interests others may have in the property, a creditor must include allegations suggesting the debtor committed the conversion with the intent to injure to adequately state a claim for relief under § 523(a)(6).[103]

In *Tague*, the Bankruptcy Court for the District of Colorado has stated the following regarding theft and § 523(a)(6):

---

[102]  Complaint, at ¶ 105.

[103]  *Barenberg v. Burton (In re Burton)*, 2010 WL 3422584, *6 (10th Cir. BAP, August 31, 2010) (unpublished decision) (citations omitted).

The basic elements of "theft" under Colorado statute parallel the standards applied in the Tenth Circuit to determine whether an injury is willful and malicious under Section 523(a)(6). [COLO.REV.STAT. § 18-4-401] minimally requires knowing and volitional misappropriation of another person's valuable property, coupled with an intent to deprive the other person of its use or benefit, regardless of whether such taking is merely unauthorized or accomplished by threat or deception. *See People v. Archuleta*, 180 Colo. 156, 503 P.2d 346 (1972). The criteria for willful and malicious injury under Section 523(a)(6) are similar in substance. "Willfulness" requires only that a debtor intentionally perform the basic act complained, i.e., that it be a deliberate and volitional act. *See In re Posta*, 866 F.2d 364, 367 (10th Cir. 1989); *In re Anzman*, 73 B.R. at 167-8. "Maliciousness" requires a showing of either: (1) a specific intent to injure; or, (2) some deliberate conduct with actual knowledge or the foreseeability that injury will necessarily result from that conduct. *In re Posta, supra; In re Compos, supra.* Taking another's valuable property knowingly and volitionally, intending to deprive them of its use and benefit, clearly falls within the scope of this standard. *In re Branch, supra.*

Here, Thomas controlled the finances and the business management of Spotlight. Thomas was directly involved with Lykins' purchase of the Vehicle and the representations made after the purchase. Although the certified funds were tendered to Spotlight, and Thomas was aware the PSCU lien needed to be paid off, Thomas used those funds to pay other Spotlight obligations. Although Thomas repeatedly testified he "attempted" to pay off the lien, the evidence reflects Spotlight wrote only one check, which was returned for insufficient funds. The Court is not convinced Thomas or Spotlight adequately attempted to pay off the lien.

Moreover, as it relates to Plaintiffs' § 523(a)(6) claims against Thomas, there is no question the failure to use those funds to pay off the lien hurt both Waknin and Lykins. With respect to whether such injury was willful and malicious, the Court finds the following testimony from Thomas instructive:

Q: When you, Mr. Thomas, individually took the certified check on behalf of Spotlight Motors yourself, what did you do with the certified funds from Mr. Lykins?
A: Exactly as I answered before. I deposited it in the business LLC checking account.
Q: And then what did Spotlight Motors use those funds for?
A: Business expenditures.
Q: But they weren't used to pay off the lien, were they?

> A: It appears as if that was attempted but not accomplished.
> Q: So the lien was not paid off, was it, with those funds?
> A: No.
> Q: Was that money yours when you took it from Mr. Lykins?
> A: No.
> . . .
> Q: Did it belong to Spotlight?
> A: A portion of it did, yes. I mean, yes, the check was written to Spotlight Motors. It was deposited in Spotlight Motors so I guess in a sense, yes, it did.[104]

Later, when asked whether the funds remaining after deducting Spotlight's commission belonged to Spotlight, PSCU or Waknin, Thomas testified he believed "the check goes into my account but, yeah, we were just -- we were supposed to pay off her loan or lien, so does the money belong to her bank? I would say yes."[105]  Thus, Thomas was aware Spotlight was obligated to pay off the PSCU lien, but used those funds to satisfy other Spotlight debts, knowing there would be no money left to satisfy the lien in favor of PSCU.

Based on the number of false statements made by Spotlight and Thomas to the Plaintiffs, along with Thomas' financial management of Spotlight, the length of time that has passed without the PSCU lien being paid off, the number of insufficient funds checks during the relevant time period, and all the facts and circumstances in this case, the Court finds Thomas acted deliberately, with actual knowledge or the foreseeability that the lien against the Vehicle would not be paid off and Lykins would not receive title to the Vehicle.  Therefore, the Court finds in favor of Waknin and Lykins on their willful and malicious injury claim under § 523(a)(6).  The same issues identified above regarding damage amounts are applicable to the § 523(a)(6) claim and are further discussed below.

E.      **Damages**

Waknin requests the Court award her the following actual damages:

| | | |
|---|---|---|
| (i) | Funds withheld from sale of automobile/dishonored check | $17,631.56 |
| (ii) | Insurance, debt servicing (interest only) on automobile | $ 1,805.30 |
| | Sub Total | $19,436.86 |

---

[104]  Transcript (Oct. 12, 2012), p. 207, lines 22-25; p. 208, lines 1-9, 15-18.

[105]  Transcript (Oct. 12, 2012), p. 210, lines 16-18.

Waknin further requests the following pursuant to Colo. Rev. Stat.
§§ 6-1-113(2)(III) and/or 18-4-405:

| | | |
|---|---|---|
| (iii) | Treble damages ($19,436.86 x 3) | $58,310.58 |
| (iv) | Interest ($19,436.86 x 480 days at 8%) | $ 2,044.86 |
| (v) | Attorney Fees and Costs up to December 21, 2010 | $19,760.00 |
| | Total | $80,115.44 |

Lykins requests the Court award him the following actual damages:

| | | |
|---|---|---|
| (i) | Certified funds paid for purchase of automobile | $21,382.42 |
| (ii) | Automobile repairs | $ 1,623.45 |
| (iii) | Insured Secured Storage 480 days times $10.00 per day | $ 4,800.00 |
| | Sub Total | $27,805.87 |

Lykins further requests the following pursuant to Colo. Rev. Stat.
§§ 6-1-113(2)(III) and/or 18-4-405:

| | | |
|---|---|---|
| (iv) | Treble damages ($27,805.87 x 3) | $83,417.61 |
| (v) | Interest ($21,382.42 x 480 days at 8%) | $ 2,966.40 |
| (vi) | Attorney Fees and Costs up to December 21, 2010 | $14,943.14 |
| | Total | $101,327.15 |

Each portion of these requests are addressed herein.

     *1.   Actual Damages*

As set forth above, and based on the evidence presented in this proceeding, the Court finds Waknin has established actual damages in the principal amount of $15,596.56, and Waknin is not entitled to prejudgment interest.

The Court further finds Lykins has established actual damages in the principal amount of $21,382.42 (the full amount he paid for the Vehicle). The Court recognizes this amount plus retention of the Vehicle would give Lykins the improper "double recovery" of both his damages and ownership of the Vehicle, and this issue is addressed below. Additionally, as previously stated, the Court cannot award Lykins the amount requested for automobile repairs, insurance or storage costs.

     *2.   Treble Damages*

In terms of the Plaintiffs' request to treble these damages pursuant to Colo. Rev. Stat. §§ 6-1-113(2)(III), the Court finds Plaintiffs have not presented

sufficient evidence to demonstrate they are entitled to such relief.  In order to recover treble damages under the Colorado Consumer Protection Act, Plaintiffs were required to show the following:

> (1) that the defendant engaged in an unfair or deceptive trade practice;

> (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation;

> (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property;

> (4) that the plaintiff suffered injury in fact to a legally protected interest; and

> (5) that the challenged practice caused the plaintiff's injury.[106]

While Plaintiffs likely established some elements, they did not meet their burden of proving the third "public impact" element.[107]

Plaintiffs did not demonstrate Spotlight and Thomas were engaged in a deceptive trade practice that significantly impacted the public.  On the contrary, from 2006 through 2009, Spotlight sold between 400 and 450 vehicles.  Haberstadt testified that twenty-one complaints were filed with the Colorado

---

[106]  *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146-47 (Colo. 2003).

[107]  In addressing the public impact element of the Colorado Consumer Protection Act, United States District Court for the District of Colorado stated:

> Relevant considerations in assessing public impact include "(1) the number of consumers directly affected by the challenged practice, (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future." *Rhino Linings USA*, 62 P.3d at 149. Public impact can be shown by reference to misrepresentations that are "directed to the market generally, taking the form of widespread advertisement and deception of actual and prospective purchasers." *Hall v. Walter*, 969 P.2d 224, 235 (Colo.1998).  On the other hand, if the wrong is purely private in nature, the CCPA does not provide a remedy. *Crowe v. Tull*, 126 P.3d 196, 208 (Colo.2006).

*Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, No. 09-CV-00970-PAB-KMT, 2011 WL 3799030, at *3 (D. Colo. 2011) (unpublished).

Motor Vehicle Dealer Board and Auto Industry Division, but Spotlight, Teta and/or Thomas were never found by the Colorado Dealer Licensing Board or an Administrative Law Judge to have defrauded a buyer or engaged in non-delivery of title.[108]  With Spotlight no longer in business, and Plaintiffs having failed to meet their burden of proving harm to any other consumers, the Court must deny Plaintiffs' request for treble damages under COLO. REV. STAT. §§ 6-1-113(2)(III).

However, with respect to the request to treble damages pursuant to COLO. REV. STAT. § 18-4-405, the Court finds Plaintiffs have met their burden of proof by a preponderance of the evidence and are entitled to treble damages.[109]  That section provides:

> All property obtained by theft, robbery, or burglary shall be restored to the owner, and no sale, whether in good faith on the part of the purchaser or not, shall divest the owner of his right to such property. The owner may maintain an action not only against the taker thereof but also against any person in whose possession he finds the property. **In any such action, the owner may recover two hundred dollars or three times the amount of the actual damages sustained by him, whichever is greater,** and may also recover costs of the action and reasonable attorney fees; but monetary damages and attorney fees shall not be recoverable from a good-faith purchaser or good-faith holder of the property.[110]

Under Colorado law, "theft" is broadly defined as follows:

---

[108]  Plaintiffs offered Mr. Cole and Ms. Malek as witnesses in an attempt to demonstrate a public impact, and the Court heard testimony from Mr. Cole and Ms. Malek regarding their individual experiences with Spotlight.  Mr. Cole's dealings with Spotlight involved Teta, not Thomas.  Transcript (Oct. 12, 2012), p. 21, lines 10-26; p. 22, lines 1-7.  Ms. Malek communicated with representatives of Spotlight, but she testified Thomas did not make any false representations to her regarding her title issue.  Transcript (Oct. 12, 2012), p. 37, lines 22-24; p. 38, lines 1-15.  No evidence was presented Spotlight or Thomas harmed Mr. Cole and Ms. Malek, but even if they were harmed along with the Plaintiffs, 4 people out of 400-450 customers would be insufficient to establish a significant public impact.  Thus, the Court finds this testimony, while credible, is not relevant to Plaintiffs' private claims against Thomas and Spotlight.

[109]  *See Hepner v. Perry (In re Kleinhans)*, 2009 WL 6415279, at *7 (Bankr. D. Colo. May 29, 2009) *aff'd* 2010 WL 1050583 (BAP Colo. Mar. 23, 2010) and *aff'd* 2010 WL 1221751 (BAP Colo. Mar. 30, 2010).

[110]  COLO. REV. STAT. § 18–4–405 (emphasis added).

If any law of this state refers to or mentions larceny, stealing, embezzlement (except embezzlement of public moneys), false pretenses, confidence games, or shoplifting, that law shall be interpreted as if the word "theft" were substituted therefor; and in the enactment of sections 18-4-401 to 18-4-403 it is the intent of the general assembly to define one crime of theft and to incorporate therein such crimes, thereby removing distinctions and technicalities which previously existed in the pleading and proof of such crimes.[111]

Further, COLO. REV. STAT. § 18–4–401 specifically defines the components of "theft" as follows:

(1) A person commits theft when he or she knowingly obtains, retains, or exercises control over anything of value of another without authorization or by threat or deception; or receives, loans money by pawn or pledge on, or disposes of anything of value or belonging to another that he or she knows or believes to have been stolen, and:

(a) Intends to deprive the other person permanently of the use or benefit of the thing of value;

(b) Knowingly uses, conceals, or abandons the thing of value in such manner as to deprive the other person permanently of its use or benefit;

(c) Uses, conceals, or abandons the thing of value intending that such use, concealment, or abandonment will deprive the other person permanently of its use or benefit;

(d) Demands any consideration to which he or she is not legally entitled as a condition of restoring the thing of value to the other person; or

(e) Knowingly retains the thing of value more than seventy-two hours after the agreed-upon time of return in any lease or hire agreement.[112]

In the instant matter, Thomas controlled Spotlight's finances, and knowingly used the certified funds from Lykins without authorization from Waknin or Lykins to pay other Spotlight business obligations rather than use the funds for their intended purpose - to pay off the PSCU lien and provide a clean

---

[111] COLO. REV. STAT. § 18–4–403.

[112] COLO. REV. STAT. § 18–4–401.

title to Lykins.  In addition, Thomas knowingly used that portion of the certified funds in such manner as to deprive both Plaintiffs permanently of its use or benefit.  Accordingly, the Court finds Plaintiffs have established a "theft" has occurred, and treble damages are proper under COLO. REV. STAT. § 18-4-405.

### 3.    Attorneys' Fees, Costs and Interest

Waknin seeks attorney fees and costs as of December 21, 2010, of $19,760.00.  Lykins seeks attorney fees and costs as of December 21, 2010, of $14,943.14.  Plaintiffs did not present any evidence at trial, or attach affidavits to their written closing supporting these figures.  However, the Court finds the Plaintiffs are entitled to an award of reasonable attorneys' fees pursuant to COLO. REV. STAT. § 18-4-405, consistent with the findings with respect to treble damages.  Thus, Plaintiffs shall each submit separate affidavits of attorneys' fees incurred **in connection with the Thomas Adversary Proceeding only** within fourteen (14) days from the date of this Order. Thomas shall have fourteen (14) days thereafter to file any objection he may have to the reasonableness of said fees.

Plaintiffs also seek interest on their damages for at least 480 days at 8% up to the date of judgment.  However, Plaintiffs are not entitled to recover prejudgment interest on their claims at a contract rate of interest because no such rate was agreed to.  While Plaintiffs may not recover prejudgment interest, the Court finds Plaintiffs are entitled to post-judgment interest from the date of judgment until paid at the rate set forth in 28 U.S.C. § 1961.[113]

Although there is no bankruptcy statute or rule specifically providing for attorney fees in the context of § 523(a)(2), (a)(4) and (a)(6), FED. R. BANKR. P. 7054(b) provides for an award of costs to the prevailing party.[114]  As set forth herein, Plaintiffs are the prevailing parties, and Thomas was put on notice of the potential award of costs as early as Plaintiffs' Complaint in this proceeding.  In

---

[113]  28 U.S.C. § 1961 provides, in part: "Interest shall be allowed on any money judgment in a civil case recovered in a district court."

[114]  FED. R. BANKR. P. 7054 provides:

**(a) Judgments.**  Rule 54(a)-(c) F.R.CIV.P. applies in adversary proceedings.

**(b) Costs.**  The court may allow costs to the prevailing party except when a statute of the United States or these rules otherwise provides.  Costs against the United States, its officers and agencies shall be imposed only to the extent permitted by law.  Costs may be taxed by the clerk on 14 days' notice; on motion served within seven days thereafter, the action of the clerk may be reviewed by the court.

this case, the Court in its discretion finds an award of costs in favor of Plaintiffs is appropriate. Thus, the Court will allow reimbursement of costs incurred by the Plaintiffs in connection with the Thomas Adversary Proceeding in accordance with FED. R. BANKR.P. 7054 and 28 U.S.C. § 1920.[115]

### 4. Damages Summary

In summary, Waknin is allowed $15,596.56 in damages, trebled to $46,789.68, plus post-judgment interest at the rate set forth in 28 U.S.C. § 1961, plus Waknin's reasonable attorneys' fees incurred in connection with this adversary proceeding, plus costs incurred in connection with this adversary proceeding in accordance with FED. R. BANKR.P. 7054 and 28 U.S.C. § 1920. Such debt is non-dischargeable in Thomas' bankruptcy case pursuant to §§ 523(a)(2)(A), (a)(4) and (a)(6).

In addition, the Court finds the appropriate damages to be awarded to Lykins include the amount required to pay off Waknin's lien with Public Service Credit Union (to obtain the ultimate relief desired - clean title being issued to Lykins), for a total of $21,382.42 in damages, trebled to $64,147.26, plus Lykins' reasonable attorneys' fees incurred in connection with this adversary proceeding, plus costs incurred in connection with this adversary proceeding in accordance with FED. R. BANKR.P. 7054 and 28 U.S.C. § 1920. Such debt is non-dischargeable in Thomas' bankruptcy case pursuant to §§ 523(a)(2)(A), (a)(4) and (a)(6).

---

[115] 28 U.S.C. § 1920, taxation of costs, provides:

A judge or clerk of any court of the United States may tax as costs the following:

(1) Fees of the clerk and marshal;

(2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title;

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree.

5.    *Constructive Trust.*

In order to ensure both Plaintiffs are compensated appropriately for their damages, but without subjecting Thomas (and Teta) to double liability, the Court has determined a constructive trust is an appropriate remedy regarding the damages in this proceeding.  The Colorado Court of Appeals has discussed the use of a constructive trust as follows:

> The mechanic's lien laws, including the Trust Fund Statute, are construed according to equitable principles.  *See Regan*, 151 P.3d at 1285. The imposition of a constructive trust on these funds is supported by equitable principles, and is consistent with the cases cited above, which recognize that the right given to the owner under the Trust Fund Statute is to enforce the statutory trust.  *In re Specialized Installers, Inc.*, 12 B.R. at 551; *First Commercial Corp. v. First Nat'l Bancorporation, Inc.*, 572 F.Supp. at 1434.  A constructive trust is an extremely flexible remedy, appropriate in circumstances to prevent unjust enrichment, particularly where innocent third persons, such as the subcontractors, laborers, and material suppliers here, have an interest in the property subject to the trust.  *See Yetter Well Service, Inc. v. Cimarron Oil Co.*, 841 P.2d 1068, 1070 (Colo. App. 1992).

> This result is consistent with the purpose of the Trust Fund Statute-to impose a trust on funds disbursed to a contractor.  Imposition of a constructive trust protects the beneficiaries of the statute identified in *Regan*; it avoids the contractor's concern of exposure to double liability; and it is consistent with the goal of avoiding unjust enrichment of the owner.  *See Regan*, 151 P.3d at 1288 n. 7.[116]

As set forth above, the Court has determined the damages and judgments in favor of both Lykins and Waknin.  However, under the reasoning set forth in *Syfrett v. Pullen*, the Court finds each judgment shall contain a constructive trust requiring any amounts recovered by either Lykins or Waknin from Thomas in this proceeding and/or Teta under the judgments entered in the Teta Adversary, shall first be paid to Public Service Credit Union, or such transferee, assignee or collection agency currently holding the debt, to pay off the lien on the Vehicle and allow Lykins to obtain clear title to the Vehicle.  Any payment of the PSCU lien shall be considered a partial payment against the judgment in this proceeding and both judgments in the Teta Adversary, regardless of whether such payment was recovered by Waknin or Lykins, from Thomas or Teta.

---

[116] *Syfrett v. Pullen*, 209 P.3d 1167, 1172 (Colo. App. 2008).

To be clear, the Court intends to prohibit double recovery by Lykins and Waknin for these debts. Accordingly, under such judgments to be issued in this proceeding and under the final judgments issued in the Teta Adversary, Lykins and Waknin each become a constructive trustee of any funds collected from Thomas and Teta, and must hold the funds for the benefit and purpose of paying off the PSCU lien first. Once the lien is paid off in full, including any related charges, fees or interest, each party is entitled to recover and retain any remaining portion of his or her respective judgment. In addition to offsetting the judgments in this proceeding with the amount of the final lien pay off, the judgments in this proceeding shall also be offset by any amounts paid by Teta, and any amounts paid by Lykins and Waknin towards the remaining PSCU lien. This avoids double recovery by Plaintiffs for the same debts.

## CONCLUSION

For the reasons set forth above,

IT IS ORDERED the debt of Defendant John Charles Thomas to Plaintiff Lori J. Waknin is nondischargeable pursuant to § 523(a)(2)(A), (a)(4) and (a)(6). A final Judgment shall enter in favor of Waknin and against Thomas in the amount of $46,789.68 in damages, plus post-judgment interest at the rate set forth in 28 U.S.C. § 1961, plus Waknin's reasonable attorneys' fees incurred in connection with this adversary proceeding, plus costs incurred in connection with this adversary proceeding in accordance with FED. R. BANKR.P. 7054 and 28 U.S.C. § 1920.

IT IS FURTHER ORDERED the debt of Defendant John Charles Thomas to Plaintiff Christopher Lykins is nondischargeable pursuant to § 523(a)(2)(A), (a)(4) and (a)(6). A final Judgment shall enter in favor of Lykins and against Thomas in the amount of $64,147.26 in damages, plus post-judgment interest at the rate set forth in 28 U.S.C. § 1961, plus Lykins' reasonable attorneys' fees incurred in connection with this adversary proceeding, plus costs incurred in connection with this adversary proceeding in accordance with FED. R. BANKR.P. 7054 and 28 U.S.C. § 1920.

IT IS FURTHER ORDERED that within fourteen (14) days from the date of this Order, Plaintiffs shall **each** file **separate** affidavits of attorneys' fees containing their total attorneys' fees incurred in connection with this adversary proceeding. Thomas shall have fourteen (14) days thereafter to file any objection he may have to the reasonableness of Plaintiffs' requested fees.

IT IS FURTHER ORDERED that within fourteen (14) days from the date of this Order, Plaintiffs shall **each** file **separate** bills of costs pursuant to FED. R.

Cɪᴠ. P. 7054 containing their respective total expenses under 28 U.S.C. § 1920 incurred in connection with this adversary proceeding.

IT IS FURTHER ORDERED the judgment shall be subject to a constructive trust as set forth above.

Dated December 27, 2013                    BY THE COURT:

Michael E. Romero
United States Bankruptcy Judge